## Jim West v. The State.

1. Murder—Evidence.—In a murder case the theory of the defense was that the deceased had threatened to take the life of the accused, and had armed himself and left his home in search of the accused for the purpose of executing his threat. *Held*, that declarations of the deceased, made when leaving his home, and declaratory of his destination and purposes, were competent evidence for the state, though not made in the presence of the accused, nor communicated to him before the killing. Such declarations are regarded as verbal *acts*, indicative of a present purpose and intention.

2. Evidence—Leading Questions.—The general rule is that questions suggestive of the desired answers cannot be allowed in the direct examination of a witness; but, to shorten the examination, it is legitimate to so far lead the witness as to apprise him of the material points on which he is to speak; and, by permission of the court, facts already acknowledged or established in the case may be recapitulated to the witness.

3. Homicide in Defense.—A party assailed and endangered in life or limb is not bound to retreat, but may pursue his adversary till the danger is past; and if in so doing a conflict ensues, and he kills his adversary, the killing is justifiable.

4. Manslaughter.—If the deceased attacked the accused by shooting at him, and then retreated and quit the combat, and the accused, under the immediate influence of sudden passion, provoked by the attack, fired upon and killed the deceased, the killing was not murder, but manslaughter.

5. Same—"Adequate Cause."—There may be other "adequate causes" for sudden passion besides those instanced in Article 599 of the Penal Code.

Appeal from the District Court of Travis. Tried below before the Hon. J. P. Richardson.

The indictment in this case was returned into court October 21, 1875, charging the appellant with the murder of George McNelly, on the 17th of the same month. At a subsequent day of the same term the case came to trial, resulting in a verdict of guilty of murder in the first degree, with imprisonment for life assessed as the punishment.

The deceased and the accused were negroes, and the principal witnesses on both sides were negroes. The evidence is characterized by much inconsistency, and in some important respects there was a direct conflict between some of

the witnesses for the state and some of those for the accused.

The fact that the deceased came to his death at the hands of the accused, and by gun-shot wounds, as charged in the indictment, was fully proved and not controverted.

The first witness for the state was Dick George, who was the only person in company with the accused and the deceased at the time of the killing. He testified that he and the accused and the latter's son came to Austin on the first Monday of the term of court, when the grand jury met, and were at the court-house ; and that on the ensuing Thursday the deceased " hunted to find out whether witness and Jim had reported him to the grand jury." That on the next Sunday morning the accused, who lived about a mile from witness, on Mr. Whipple's farm upon Gilleland creek, came to witness' house about breakfast time, having with him a gun which witness had seen him always carry ever since he had known him. That accused stayed about an hour, when witness started to go to Mr. Pfleuger's, and accused asked him to go by his house with him, that being the nearest way. Witness went on horseback and the accused on foot, and as they went through the prairie they saw McNelly, the deceased, going past the house of the accused and towards Joel McGee's, in the same settlement. A very few minutes afterwards witness again saw the deceased, who was on horseback and approaching witness and the accused. The deceased rode up alongside of witness, and asked witness if he had seen any Mexicans. Witness told him he had not, and deceased asked the accused the same question and received the same answer. Accused was then from three to five steps from witness, and the deceased and witness close together. As soon as the accused told deceased he had seen no Mexicans, the deceased said, " Jim, what you got your gun cocked for, G—d d—n you?" Accused replied, "George, the gun is not cocked."

Deceased then got down from his horse on the opposite side from witness, and, resting his left arm on the saddle, put his right hand behind him and kept inching along towards his horse's tail.   He came around behind his horse as he sprang forward, and sprang right under the neck of witness' horse and fired.·  Witness' horse threw him and ran away, and after that witness heard two more shots, and saw the deceased running toward a bunch of timber, where there was one large tree and some smaller ones.   He seemed to be making for the large tree, but fell before getting quite to it. .Witness did not go up to where he fell ; did not know that he was shot, nor hear him say anything after the shooting. Witness hallooed for help as soon as he could, but nobody came for some time.   The wife of the accused came first, and then deceased's wife came and witness went off after his horse.   As witness went away he saw two colored men standing off about 100 or 150 yards, towards Joel McGee's house, but did not know who they were.

This witness further testified that, on the Thursday next before the killing, the deceased came to Rector's gin to see witness, and asked witness how he happened to report him to the grand jury, saying he thought Jim West, the accused, dragged witness into doing so ; that the deceased was angry, and witness said to him, "George, you and Jim stop this before you get into trouble."   He said, speaking of the accused, "G—d d—n him, I will make him take water." Witness told him that he did not report him, and did not know whether the accused did or not.

The next witness for the state was Aaron Billingsly, who stated that he was at Joel McGee's house on the morning·of the killing, when the deceased came by there and asked witness if he had seen any Mexicans, saying that some Mexicans had borrowed his knife and gone off with it.   Deceased then started off, and witness and Jake White followed him. Deceased met the accused and Dick George, and the accused

said, "Now, G—d d—n you, I have got you." Deceased begged, and accused said, "G—d d—n you, I have got you." Deceased started off, and accused shot him. Deceased dodged, and accused shot him again, and then he threw up his hands and fell. ˍAccused then went off towards his house, saying, "G—d d—n him, I have killed him, and, if you want to see him, go and look at him."

This witness further testified that the accused halted the deceased before the latter got to him ; that the deceased said, "Jim, I am not after any fuss this morning ; I am after a Mexican that borrowed my knife and went off with it." Witness did not see the deceased have any weapons. Deceased made no effort to shoot or cut the accused. The accused had a seven-shooting gun. When the accused raised his gun the deceased jumped off his horse on the opposite side. Accused ran around that side, and deceased ran to the other side of the horse ; accused pursued him around, and the deceased broke for the thicket. He ran some distance before he was shot the first time, and some five or six steps further before he was shot the second time. He had a piece of meat tied to his saddle, but no coat, blanket, or pistol, so far as witness saw.

Jake White, the next witness for the state, was along with the previous witness, Aaron Billingsly, at Joel McGee's house, on the morning of the killing. His testimony was in substance similar to Aaron's, but with many circumstantial discrepancies.

Julia McGee, her husband, Joel McGee, and Eliza Kelly were also examined by the state. The general tenor of their testimony accorded with that of Aaron Billingsly, but in many collateral particulars these several witnesses disagreed.

Caroline McNelly, wife of deceased, testifying for the state, said that, on the morning of the killing, the deceased left home to overtake a Mexican who had borrowed his knife to cut some meat with, and had gone off with it. Deceased

wanted the knife and asked his daughter about it, and she told him the Mexican had taken it; that the deceased rode off, and the next thing witness knew about him was that Dick George told her he was dead. Witness and her brothers went to where the deceased was, and met the accused on the way. Deceased had no arms when he left home, and none at home; he did not own a pistol. He and witness were fixing that morning to go down to his mother's, and he had some meat tied to his saddle, in a wallet, to take down to his mother.

On the testimony of the foregoing witnesses the prosecution rested.

The first witness introduced by the defense was George West, a step-son of the accused. He stated that, on the Thursday before the killing, the deceased came to the fence of the accused just about dusk, and called the accused out. Accused and his wife went out near the fence, and deceased said, "Jim West, what did you shoot at my dog for?" Accused replied, "I did not shoot at your dog; I shot down in the ground, between the legs of your dog, to keep him from biting me." Deceased had a pistol in his right hand, down by his side. Witness had seen the same pistol before, at deceased's house and in his hands. Deceased said, "Well, we will not multiply words about it; I will see you before Saturday night, and put more holes in you than there is in a sifter."

This witness further testified that the accused was a witness before the grand jury previous to the killing, and that witness was along with him in town on that occasion. That the deceased came up to where witness and the accused were standing, and asked the accused what he came there for; and after a little the deceased said to the accused, "I know you have been talking to the Pfleugers about my stealing cattle. Jim West, I'll kill you before Christmas." Accused then got up and went around the court-house to

Statement of the case.

get away from the deceased, who then asked witness, "What did you come for?" Witness told him he did not know what he was wanted for, and the deceased said, "Never mind; I'll fix Jim West and old Dick George before Christmas." Witness went around the house and told the accused what the deceased had said. All this was about two weeks before deceased was killed.

Witness heard the shooting when the deceased was killed, but could not see the parties. There were three shots; heard Dick George say, "George, what have you done?" We heard the pistol first, then the voice, and then two guns. Witness saw a pistol lying on the ground right by the elbow of the deceased; did not see it picked up; it was not the pistol of the accused. Witness saw the same pistol in the hands of deceased on Thursday evening previous, when he came and called the accused out to the fence. It had a brass handle, and shot five times. Witness stooped down and counted the number of barrels in the cylinder, when the pistol was lying on the ground by the dead body.

Several witnesses for the defense stated that the deceased was reputed to be a resolute and dangerous man.

Quincy West, the wife of the accused, testified in his behalf. She gave the same account as her son George of the threat made by the deceased to the accused on the Thursday evening prior to the killing. She also heard the shooting when the deceased was killed. She first heard a pistol-shot; then heard Dick George say, "G—d dang fool! George McNelly, see what you have done;" then heard two gun-shots, and then some one say, "Come here, come here!" Thinks the killing was about 100 yards from her house, and about 400 from Joel McGee's. She and her children ran up there, and found deceased lying on the ground, dead, with a pistol lying near him. Does not know what became of the pistol. Looked at the body some time and was going away, when she saw Aaron Billingsly,

30

Eliza Kelly, and Jack White coming up, and next after them Mrs. McNelly and her brothers.

Alice West, a daughter of the last witness, gave very similar testimony to her mother's, in all material respects.

Jim West, a son of Mrs. West, fully concurred with the rest of the family, but proved his superior power of observation by stating that he saw Mrs. McNelly, the wife of the deceased, pick up the pistol from near his body and hand it to her brother, Sterling Crayton. Knew it to be deceased's pistol, because he had seen him with it on several previous occasions.

Riley George, for the defense, testified that, on the evening before the killing, the deceased came to witness' house and asked if the accused was there. Witness told him that the accused had gone home. Deceased asked which side of the creek the accused went off on; and, on witness telling him the other side, he went over to that side and off in the direction taken by the accused.

A. Rainey, for the defense, stated that, on the Thursday prior to the killing, the deceased told him that either he (McNelly), or old Dick George, or Jim West, the accused, would have to leave the country before that day week.

Jim West, step-son of the accused, recalled for the defense, stated that he saw the saddle taken from the horse of the deceased; that there was a black coat and a wallet of provisions on it, and two blankets and a quilt under it; that, when the wallet of provisions was untied, Mrs. McNelly said, "Take that piece of meat on home; it is the last piece of meat in the house."

The defense having rested their case, Mrs. McNelly was recalled by the state, in rebuttal, and she squarely contradicted several of the most material of the statements made by Mrs. West and her children. She said that she and her brothers got to the body before Mrs. West and her children did; that there was no pistol on the ground, nor

any pistol picked up by her, or handed by her to her brother; that deceased owned no pistol, and took none with him that morning; that she saw no pistol, or coat, or quilt, or blanket; that neither Mrs. West nor any of her children were close to the body of the deceased while witness was there.

*Sheeks & Sneed,* and *R. S. Brockenborough,* for the appellant.

1st. The court erred in admitting the testimony of Joel McGee, Eliza Kelly, and Julia McGee, touching conversation had by said witnesses with the deceased, George McNelly, on the morning of, and before, the killing, as shown by defendant's first bill of exceptions. There it will be seen that "defendant, by counsel, objected because the statements were made by deceased, not in the presence of defendant, and because there was no evidence showing, or tending to show, that defendant had any knowledge of such conversation at or before the killing, and that therefore such conversation would not have had any influence on the mind of defendant at the time of the killing, which objection was overruled by the court, because two witnesses had been permitted to detail to the jury the said conversation before, without objection to it." The ruling of the court turns plainly upon the question of *time* on part of defendant, in raising objection after two witnesses had been allowed to detail the same conversation. We hold that the admissibility of the testimony of the three witnesses, Joel McGee, Eliza Kelly, and Julia McGee, turns upon a point of law, and not of time. It was clearly illegal, because it was hearsay and wholly immaterial. For these reasons was it illegal, as well as for the reasons presented by the bill of exceptions already quoted. It is hearsay because it purports to be the statement of a third party, who was not in court, who was not bound by oath when they were alleged to have been

made, and who, not being in court, and not being confronted by the defendant, could not be subjected to cross-examination by the party to be affected thereby. Illegal testimony improperly received, which, in connection with the charge, may have influenced the minds of the jury, will cause reversal of judgment. *Thurmond* v. *Trammell*, 22 Texas, 257. In the *Berkeley Peerage Case*, 4 Camp. 414, Lord Mansfield said: "If material witnesses happen to die before the trial, the person whose cause they would establish may fail in the suit. But, although all the bishops on bench should be ready to swear to what they heard those witnesses declare, and add their own implicit belief of the truth of the declarations, the evidence would not be received."

We do not lose sight of the fact that the rule excluding hearsay evidence is subject to many exceptions; that what is and what is not part of the original *res gestæ* is the criterion by which to determine the admissibility or exclusion of hearsay evidence; that, "if the words are the natural accompaniment and consequence of the act, they may be stated, but when the connection is remote they will be rejected." Powell's Ev. 75. The rule adopted, however, in criminal cases is very stringent. "Thus, in cases of rape, it has been the practice of modern judges to reject the evidence of the statement of a deceased or absent prosecutrix, although made at, or immediately after, the commission of the crime." Powell's Ev. 75. But in this case the alleged declarations of the deceased were not only not made at, or "immediately after, the commission of the crime," but before the act, and were utterly foreign to the issue, if made at all, and should have been excluded on that ground, if on no other.

Allowing previous illegal testimony to one fact to go in without objection was by no means waiver of objections to subsequent testimony to the same fact, if objection was made at the proper time for its exclusion—as was actually

the case.　The objection made by counsel for appellant did not have in contemplation the exclusion of that testimony with the jury previous to the objection raised, but the exclusion of that subsequent to it.

2d. The court erred in permitting the district attorney to ask Caroline McNelly certain questions, and in permitting said Caroline to answer the same, as shown by defendant's 2d bill of exceptions.

It will be noticed by the court that, after the testimony for the defense had closed, the state recalled said Caroline, in rebuttal, and that she was brought back upon the stand in the capacity of an original witness, and that therefore the district attorney had no right to ask leading questions in direct examination.　She did not appear by her conduct to be hostile to the party producing her, or in the interest of the other party, or unwilling to give evidence.　There was no failure of recollection, producing an omission in her testimony, thereby permitting suggestion.　No numerous items of dates were involved.　There was no indication that the mind of the witness could not be directed to the subject of inquiry.　The court is familiar with these exceptions, as contained in all the books on evidence, and under which the judge is allowed to use his discretion in permitting leading questions; but in this case the avenue was not open to the judge for the use of that discretion.　"If a party or his counsel were allowed to put a question to their own witness which the latter might answer by a mere affirmative or negative, it is apparent that the evidence would be the statement of the party, and not of the witness.　Such a course would strike radically at the credibility of all oral evidence, and, therefore, it is a sound and established rule that, on the examination-in-chief, leading questions must not be asked." Powell's Ev. 376.

3d. The court erred in its charge to the jury.

(1.) As to defendant's right to act in self-defense, its

duty was to instruct the jury " as to the law arising on the facts." Pasc. Dig., Art. 1464. The adversative clause of the charge on self-defense is as follows : "But, when a person is attacked, his right to resist ceases when the attack ceases,. and he has no right to kill after the danger to life or limb· is over." As an abstract proposition this may be true, but, "although an instruction be correct in the abstract, or applied to a different state of the case, if it have no proper·· application to the case proved, and is calculated to mislead, and probably did mislead, it is error for which the judg--ment must be reversed." *Hancock* v. *Horan*, 15 Texas,. 507. Also, same in substance, *Austin* v. *Talk*, 26 Texas,. 130, 131.

"In testing the correctness of a charge from the judge to·· the jury, it must not be taken as an abstract proposition,. but must be considered in connection with the issue and the·· evidence." *Norvell* v. *Oury*, 13 Texas, 32. Now, the facts in the case under consideration demanded that this clause· should have been supplemented and explained by a clause to the effect that, if from the evidence they believed that the· ·attack was only suspended until McNelly could reach a point in adjacent timber where he would be protected and shel--tered, and from which McNelly intended to continue an. attack already commenced by him, then defendant was not. bound to wait until McNelly reached the timber and renewed his attack, but defendant had the right to antici--pate the purpose of McNelly, and take such steps as were· necessary to avert it. Taking the clause as it stands in the·· charge, in connection with the testimony, they would natu--rally conclude that the fact of McNelly's intent, immedi--ately after the first shot, was proof enough that the attack. had ceased on his part, and that all danger to the appellant. had passed. Without it the jury was left wholly in the dark. as to the extent of appellant's right to act. The person· attacked, not only need not retreat, " but may pursue his

adversary till he find himself out of danger; and, if in a conflict between them he happeneth to kill, such killing is justifiable. The right of self-defense in cases of this kind is founded on the law of nature, and is not, nor can be, superseded by any law of society.'' 1 Whart. Cr. Law, 456. With equal force is this question treated in *Lander* v. *The State*, 12 Texas, 476; 3 Greenl. on Ev., sec. 116; 2 Stark. on Ev., part 1, p. 721; and 4 Bl. 183, and note by Chitty.

( 2. ) The court also erred in refusing to instruct the jury, as requested by counsel for appellant, touching the matter of threats made by deceased against the life of appellant at various times prior to the killing. It was asked that the jury be instructed to find not guilty if such threats were made by deceased and communicated to defendant, and if, at the time of the killing, some act was done by deceased manifesting an immediate intention to execute said threats. It will be seen that the instructions were refused because the jury were sufficiently instructed as to the law of self-defense in the general charge. It has been said elsewhere that the jury should be instructed as to the law arising on the facts. This is what the statute requires; and, as there we think it was sufficiently shown that the general charge on self-defense fell short as to defendant's right to act, so here we hold that it fails to meet the statutory requirements; that the law arising on the facts did justify and demand the instructions asked as to threats.

In answer to the second reason of the court for refusing instruction, to wit, that the evidence did not justify such direction to the jury, we refer the court to the testimony of George West, who testified that McNelly, in reply to Jim West's denial of having shot at his dog, said, " Well, we'll not multiply words about it; I will see you before Saturday night, and put more holes in you than there is in a sifter.''

Now, the testimony of Quincy, Alice, Tom and George

West, and of Al Rainey is referred to, to show that threats were made against the life of the appellant; that of Riley George, to show, by his earnest inquiries and immediate pursuit of Jim West, his anxiety to execute them; that of Dick George, to show that, when deceased and appellant met on Sunday morning, October 17, "the time of the homicide, the person killed, by some act then done, manifested an intention to execute the threat so made." Code Cr. Proc., Art. 2270. In the attempt to carry his threats into execution, McNelly was killed by Jim West, in protecting himself against their execution, as shown by Dick George's testimony. Subjecting the facts in this case to the test required by the opinions of the court, as expressed in 27 Texas, 567, and in 33 Texas, 505, we irresistibly conclude that the killing of McNelly was justifiable homicide.

Previous threats by deceased to kill defendant, or to do him serious bodily injury, were clearly established. Some of these threats were made to defendant in person, and others were communicated to him. Dick George, a witness for the state, clearly shows that, at the time of the killing, deceased, by acts then done, manifested an immediate intention, coupled with the ability, to execute the threats. It was the duty of the court, whether asked or not, to instruct the jury fully on the law as to threats. The failure to do so was error, and especially the refusal to do so was palpable error, for which this cause should be reversed, if for no other. Pasc. Dig., Art. 3059, and authorities cited in note 744.

4th. The court did not charge all the law applicable to the facts of the case.

The attention of this court is especially called to Article 3059, and to the last sentence of Article 3060 of the Code of Criminal Procedure, wherein is set forth the court's duty as to its charge. Whether asked or not, the court should charge distinctly and plainly the law applicable to the case—

and by this is surely meant *all* the law applicable to the case. " It is the duty of the district judge, on the trial of a criminal charge, to so frame his instructions that they shall have a direct application to the facts in evidence." *Haynes* v. *The State*, 40 Texas, 52. Had this duty been performed by the court below, its charge must necessarily have contained all " the law applicable to the case, as developed by the facts proved on the trial." Hence we hold that the court erred in not charging as to the law of manslaughter.

We are familiar with the former decisions of the court wherein the opinion is held that, if the offense is either murder or justifiable homicide, it is not necessary to charge as to manslaughter. But we submit to the court that this is a case which, from its peculiar facts and circumstances, required the issue of manslaughter to be submitted to the jury.

*H. H. Boone*, Attorney General, for the State.

ECTOR, P. J.    The defendant was tried at the October term, 1875, of the district court of Travis county, charged with the murder of George McNelly. The jury found him guilty of murder in the first degree, and assessed his punishment at imprisonment in the penitentiary " for the term of his natural life." From the judgment of the court below the plaintiff has appealed, and rests his case before this court upon the first five errors assigned.

" 1st. The court erred in admitting the testimony of Joel McGee, Eliza Kelly, and Julia McGee, touching conversations had by said witness with deceased, George McNelly, on the morning of, and before, the killing, as shown by defendant's bill of exceptions." We can see no injury that was done by the admission of this evidence. The same facts had already been testified to by two witnesses, and allowed to go to the jury without objection.

The theory of the defense was that deceased had made threats to take the life of the defendant; that he had armed and prepared himself, and left home on the morning of the killing, to carry his threats into execution, and then leave the country. It was competent to prove what he said and did at the time he was in the act of leaving home, on his journey, expressive as to where he was going. Such declarations, made at the time of the transaction and expressive of its character, are regarded as "verbal acts indicating a present purpose and intention," and are therefore admitted in proof, like any other material facts. 1 Greenl. on Ev., sec. 108; 1 Ph. on Ev. 150, title Declarations, part of the Res Gestæ.

The 2d assignment of errors is that the court erred in permitting the district attorney to ask Caroline McNelly certain questions, and in permitting her to answer the same, as shown by defendant's 2d bill of exceptions. Caroline McNelly was the wife of the deceased. There was no disposition on her part to keep back anything she knew, or to refresh her recollection.

In the direct examination of a witness it is not allowed to put to him or her what are called leading questions—that is, questions which suggest to the witness the desired answer. This rule is to be understood in a reasonable sense. To shorten the examination, and to bring the witness as soon as possible to the material points on which he is to speak, the counsel may lead him to that length, and may, by the permission of the court, recapitulate to him the acknowledged facts of the case which have already been established; and in some cases leading questions are permitted even in a direct examination. The correct rule on this subject is clearly laid down by Mr. Greenleaf. 1 Greenl. on Ev., secs. 434, 435, 447.

It became a material inquiry to know whether there was any pistol lying on the ground by the side of the deceased

soon after he was shot. Several witnesses introduced by the defendant had testified that they saw a pistol lying near the right arm of the deceased. The first witness introduced by the state, and the only witness who was present at the time of the homicide, testified that the deceased commenced the difficulty, and assaulted the defendant by shooting at him with a pistol. The questions objected to do not suggest the answer desired; and, while we believe they should have been differently framed, still their admission in the form asked, if erroneous at all, is not such an error as would require a reversal of the case.

The 3d and 4th assignments of error are as to the charge of the court, and mainly that the court did not give a charge on manslaughter. There is quite a conflict in the evidence. The 7th subdivision of the charge of the court is as follows: " Every person has a right to defend himself against an unlawful attack upon his person, of such a character as to endanger his life or limb, and, if he has reasonable cause to apprehend danger to his life or limb from an attack which is made upon him, he may kill his assailant if it be necessary to protect himself, and such killing would not be murder. But, when a person is attacked, his right to resist ceases when the attack ceases, and he has no right to kill after the danger to life or limb is over."

The counsel for the defense insists that the facts in the case demanded that the clause of the charge which we have copied above should have been supplemented and explained by a clause to the effect that, " if from the evidence they believed that the attack was only suspended until McNelly could reach a point in adjacent timber where he would be protected and sheltered, and from which McNelly intended to continue an attack already commenced by him, then defendant was not bound to wait until McNelly reached the timber and renewed his attack, but defendant had the right

to anticipate the purpose of McNelly, and take such steps as were necessary to avert it."

Taking the clause as it stands in the charge, *qualified as it is by the last part of it*, in connection with the testimony, we do not believe that the jury were misled by it, or from it would naturally conclude that the fact of McNelly's retreat after the first shot was proof enough that the attack had ceased on his part, and that all danger to the appellant had passed. The person attacked, not only need not retreat, but may pursue his adversary till he find himself out of danger; and, if in a conflict between them he happen to kill, such killing is justifiable. " The right of self-defense in cases of this kind is founded on the law of nature, and is not, nor can be, superseded by any law of society." 1 Whart. Cr. Law, 1019.

The gravest error, in our opinion, which was committed on the trial of the cause was the failure of the lower court to charge on the subject of manslaughter. This is a case which, from its peculiar facts and circumstances, required the issue of manslaughter to be submitted. The record is entirely silent as to any disposition on the part of the defendant, prior to the killing, to inflict any personal injury on the deceased.

If the deceased attacked the defendant, and, after shooting at him, he, the deceased, unequivocally retreated and quit the combat as far as he could, and the defendant then, under the immediate influence of sudden passion, produced in his mind by the violent assault made upon him by McNelly, fired upon and killed McNelly, then he would not be guilty of murder, but of manslaughter.

If this conduct on the part of the deceased had the effect to produce sudden passion in the mind of West, rendering it incapable of cool reflection, and if the killing was done under the immediate influence of that passion, then the kill-

ing would only be manslaughter. As to whether the killing was done under the immediate influence of sudden passion, rendering the mind incapable of cool reflection, arising from an adequate cause, were questions of fact for the jury, and should have been submitted to them.

It may be that the judge below took the view of Paschal's Digest, Article 2254, that there could be no " adequate cause for passion " beyond those stated in that Article. If so, he was in error. Our supreme court say: " Articles 2251, 2252, 2253, and 2254, Paschal's Digest, are explanatory of Article 2250. We do not understand that these explanations and examples are legislative restrictions, and that in no case can a homicide be reduced from murder to manslaughter unless the party can bring himself within the rules and examples given. We regard the law rather as giving instances or examples by which the mind could be rendered incapable of cool reflection, but that, at least, we must bring each case to the test to be found in Article 2250, Paschal's Digest." *Johnson* v. *The State*, 43 Texas, 615.

For the failure of the court to give a charge on the subject of manslaughter, the judgment is reversed and the cause remanded.

*Reversed and remanded.*